UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
BROWARD DIVISION

ROBERT L. GUESBY,

    Plaintiff,

             Case No. 00-6136-CIV-Zloch
  v.          Magistrate Judge Seltzer

HUMANA INC.,

    Defendant.

                 \

## CIVIL RICO STATEMENT
## PURSUANT TO LOCAL RULE 12.1

Plaintiffs respectfully submit this Civil RICO Statement pursuant to Rule 12.1 of the

Local Rules for the United States District Court for the Southern District of Florida.

1.  <u>The Unlawful Conduct Alleged by Plaintiffs</u>

As described in more detail herein, Defendant Humana, Inc. (hereinafter "Humana" or the

"Defendant") engaged in unlawful conduct actionable under the Racketeer Influenced and

Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et* seq., and in particular 18 U.S.C. §

1962(c), which provides, in relevant part, that "It shall be unlawful for any person . . . associated

with any enterprise engaged in . . . interstate . . . commerce, to conduct or participate in the

conduct of such enterprise's affairs through a pattern of racketeering activity."

As described in more detail herein, Defendant Humana is alleged to be liable under 18

U.S.C. 1962(c) because:

(a)  Humana participated in the operation and management of both a national health

    care network, and state and local health care networks, consisting of Humana, the

Humana Health Plans, primary doctors, medical specialists, medical laboratories, hospitals, outpatient centers, pharmacies and home health agencies. The participants in each of the national, and state and local, health care networks were associated in fact for the common purposes of providing medical services to Humana customers and earning profits from providing those services, and each network was thus an "enterprise" as defined in RICO.

(b)    Humana engaged in an open-ended pattern of racketeering activity involving multiple acts of mail fraud, by which Humana knowingly and intentionally deceived the alleged Class Members – that is, the participants in Humana health plans (including health maintenance organizations ("HMO's"), preferred provider organizations ("PPO's") and point-of-service plans ("POS's")) – by failing to disclose, and covering up, the true criteria and practices used to make decisions regarding treatment and benefits.[1] Those actual criteria and practices, described in detail herein, were used purposefully by Humana to provide the Class Members with health insurance coverage that was worth less than the premiums paid by Class Members for the coverage described by Humana in documents Humana delivered or caused to be delivered to Class Members by means of the United States Postal Service. Among other things:

---

[1]    As set forth in more detail herein, the alleged "RICO Class" in this action consists of all persons in the United States who purchased coverage or otherwise participated in HMO's, PPO's, and/or POS's operated by Humana at any time during the period from October 4, 1995 through and after the date of the Complaint until Humana's continuing illegal and wrongful conduct has ceased.

2

    (i)      Humana concealed from Class Members that it established a set of financial incentives for claims reviewers – including direct cash bonus payments – designed to encourage denial of claims without regard to the medical needs of patients. Indeed, Humana's incentives encouraged claims reviewers to deny claims or limit hospital admissions regardless of whether such claims or admissions satisfied the criteria for medical necessity set forth in Humana's own health plan documents.

    (ii)    While Humana consistently told Class Members that coverage and treatment decisions would be made on the basis of "medical necessity," Humana in fact made treatment and coverage decisions based on a variety of concealed, cost-based criteria that were different from, and in some cases inimical to, the medical necessity definition that Humana disclosed to the members of the Class.

    (iii)   Humana also concealed from Class Members that, in certain circumstances, Humana subcontracts the claims review process – and with it, the authority to decide the scope of participants' medical coverage – to third parties, and that these third parties, in turn, have based claims approval decisions, in whole or in part, on undisclosed criteria that were different from, and sometimes wholly unrelated to, the medical necessity definition that Humana disclosed to the members of the Class.

    (iv)   Humana also did not disclose to Class Members that Humana provides direct financial incentives to physicians that are intended to reduce the

3

amount of care provided to Class Members, regardless of medical necessity.

    (v)    Humana also concealed from Class Members that both Humana and third parties with whom Humana subcontracted allowed persons without appropriate medical training and/or specialization to make claims review determinations.

    (c)    Humana engaged in this wrongful conduct with the purposes and goals of fraudulently inducing the maximum number of persons to subscribe to Humana Health Plans for the benefit of Humana (including increasing Humana's profits), and to implement those plans in a manner that would provide Class Members with insurance coverage of lesser value than the coverage disclosed by Humana to the members of the Class. By means of this conduct, Humana unjustly enriched itself by millions of dollars at the expense of the Class Members, who paid premiums to Humana using their cash, salary deductions, and/or labor.

In this action, plaintiffs have expressly disavowed any effort to attack managed care generally or to suggest that certain managed care practices are socially preferable to others. Indeed, as noted in paragraph 5 of the Complaint, "This action does not challenge the legitimacy or wisdom of 'managed care' as a means of delivering health services in the United States." Complaint ¶ 5. Rather, this action concerns a pattern of racketeering activity whereby Defendant Humana failed *to disclose* the *truth* about the incentives, criteria and practices Humana chose to use in providing managed care to Class Members. This lawsuit is not an effort to legislate new laws through the courts. Rather, it is Humana's pattern of wrongful conduct, by which Humana

fraudulently concealed the incentives, criteria and other practices detailed herein, that subjects Humana to liability under existing law.

2.      The Defendant and the Defendant's Misconduct

Defendant Humana, Inc. is the sole defendant in this action. Humana is a Delaware corporation with corporate headquarters in Louisville, Kentucky. Humana securities are traded on the New York Stock Exchange. The majority of Humana's membership is located in 15 states including Florida, as well as Alabama, Arizona, Arkansas, Georgia, Illinois, Indiana, Kentucky, Mississippi, Ohio, South Carolina, Tennessee, Texas, Wisconsin and Wyoming. Humana offers health plans and other employee benefit plans in at least 38 states including (in addition to the 15 states listed above) Alaska, California, Nevada, Idaho, North Dakota, South Dakota, Colorado, Nebraska, Missouri, Oklahoma, Louisiana, Iowa, New Jersey, Utah, Maryland, Virginia, West Virginia, North Carolina, Michigan, New Mexico, Hawaii and Kansas.

Since 1983, Humana has provided health care services to approximately 6.2 million persons annually.

A.      The Defendant's Alleged Misconduct

Defendant Humana engaged in unlawful conduct actionable under RICO and, in particular, 18 U.S.C. § 1962(c), which provides, in relevant part, that "It shall be unlawful for any person . . . associated with any enterprise engaged in . . . interstate . . . commerce, to conduct or participate in the conduct of such enterprise's affairs through a pattern of racketeering activity."

Humana participated in the operation and management of a national health care network, and state and local health care networks (see paragraphs 6(A) and 6(B) below) through an open-

5

ended pattern of racketeering activity within the meaning of 19 U.S.C. § 1961(5). This pattern of racketeering activity has involved predicate acts of mail fraud (18 U.S.C. §§ 1341 and 1342), with the purpose and goal of fraudulently inducing persons to join Humana health plans at prevailing premium rates, thereby permitting Humana to enrich itself unjustly by providing health insurance coverage of lesser value than the premiums paid to Humana by the Class Members.

(1)    Since October 1995, Humana has repeatedly delivered or caused to be delivered to Class Members, by means of the United States Postal Service, documents containing material misrepresentations and omissions concerning Humana's determination of coverage for claims submitted by Class Members and the amount, quality and circumstances of covered care and services actually offered by Humana health plans. These documents (hereinafter "Humana's Disclosure Documents") include (i) summary plan descriptions, (ii) certificates of coverage, (iii) other plan descriptions, enrollee handbooks and promotional materials that Humana mailed or caused to be mailed to each member of the Class after each Class Member became a participant in a Humana health plan; (iv) the notifications that Humana mailed or caused to be mailed to Class Members setting forth modifications and changes to the plan; and (v) the penta-annual updated summary plan descriptions that Humana mailed or caused to be mailed to Class Members and that integrated all plan amendments made within such five-year period.

(2)    Humana knowingly stated in the Humana Disclosure Documents that treatment and coverage decisions under Humana Health Plans would be based on a

definition of "medical necessity" set forth in the Humana Disclosure Documents (hereinafter the "Humana Medical Necessity Definition"). The Humana Medical Necessity Definition provides that medical services and supplies are medically necessary when they are:

– consistent with the symptom or diagnosis and treatment of the member's injury or sickness;

– appropriate with regard to standards of good medical practices;

– not solely for the convenience of a member, physician, hospital or ambulatory care facility; and

– the most appropriate supply or level of service which can be safely provided to the member. When applied to the care of an inpatient, it further means that the Member's medical symptoms or condition require that the services cannot be safely provided to the member on an outpatient basis.

(3)   In the Humana Disclosure Documents, however, Humana has fraudulently concealed from Class Members certain incentives, criteria for decision making, and other practices that have the purpose and effect of reducing the value of the Health Plans for which Class Members paid through their premiums:

(a)   The Humana Disclosure Documents failed to disclose that Humana provides direct cash bonuses and other financial incentives to claims reviewers who deny claims for services or limit hospital admissions and stays regardless of whether those claims or hospital admissions otherwise

7

satisfied the Humana Medical Necessity Definition. The bonuses and financial incentives provided by Humana have included, among other things, a "Utilization Incentive Plan" that has provided for direct bonus payments and other benefits to claims reviewers who denied a certain percentage or number of submitted claims for hospital costs from Class Members, irrespective of whether the submitted claims satisified the Medical Necessity Definition. These incentives thus reduced the value of the health coverage for which Class Members paid.

(b)     The Humana Disclosure Documents also failed to disclose that in addition to, or in place of, the Medical Necessity Definition, Humana uses undisclosed cost-based criteria to approve or deny benefit claims by Class Members. These undisclosed cost-based criteria include, without limitation: (i) Interqual Criteria; (ii) Milliman & Robertson guidelines; and (iii) guidelines and criteria developed and/or used by Value Health Sciences (hereinafter, the "Undisclosed Cost-Based Criteria"). While the Undisclosed Cost-Based Criteria vary in detail, they all, in whole or in part, base coverage determinations on considerations other than medical necessity and inconsistent with the terms of the Humana Medical Necessity Definition set forth in the Humana Disclosure Documents. The Undisclosed Cost-Based Criteria were used by Humana to reduce the level of medically necessary services available to Class Members, and thereby did reduce the value of the health coverage for which Class Members paid.

8

(c)    The Humana Disclosure Documents failed to disclose that Humana subcontracts to third parties, such as Value Health Sciences, responsibility and authority to review claims and manage benefits, for certain medical conditions and medical procedures.  In determining payment eligibility for claims submitted by Class Members, these third parties use criteria different from, and more restrictive than, the Humana Medical Necessity Definition.

(d)    The Humana Disclosure Documents failed to disclose that in determining payment eligibility for claims submitted by Class Members, Humana (as well as third parties with whom Humana subcontracted) has used both physicians and non-physicians who have lacked the training and specialization necessary to determine whether particular benefits should be provided in accordance with the Humana Medical Necessity Definition furnished to Class Members in the Humana Disclosure Documents.

(e)    The Humana Disclosure Documents failed to disclose that Humana creates direct financial incentives to treating physicians and other health care professionals to deny coverage to individuals enrolled in Humana health plans, even when the treatment for which the coverage is proposed satisfies the Humana Medical Necessity Definition.  Among other things, Humana failed to disclose that:

(i)    Humana enters into risk-sharing arrangements with physicians, including without limitation so-called "capitated payment"

9

arrangements, that provide treating physicians with financial incentives not to prescribe or recommend particular treatments for Class Members (even if such treatment is otherwise medically necessary as defined in the Humana Medical Necessity Definition).

(ii)    Humana contracts to use Value Health Services' Practice Review System to analyze the clinical practice patterns of individual physicians, physician networks and health care plans in order to identify both "cost effective" physicians and physicians who "over utilize" health services for their patients.  Humana notifies network physicians of undesirable practice profiles (that is, health service utilization rates) and reminds network physicians that Humana contracts only with practitioners who provide "appropriate utilization."  These notifications pressure network physicians to restrict care and prescribe medical services that satisfy criteria other than those contained in the Humana Medical Necessity Definition.

(iii)    Humana engages in undisclosed automatic "downcoding" of claims submitted by physicians, a process whereby (among other things) Humana arbitrarily changes the benefits code assigned to rendered services so as to reduce the payments due physicians. Arbitrary and automatic downcoding creates a disincentive for physicians to perform certain medical procedures, even when

medically necessary, because they are not likely to be paid for them.

Taken together, these various undisclosed arrangements and incentives are designed by Humana to influence the extent of coverage available to Class Members in a manner that is inconsistent with the Humana Medical Necessity Definition, because such incentives are designed by Humana to make it more likely than otherwise that doctors would deny care (or a level of care) otherwise satisfying the criteria included in the Humana Medical Necessity Definition. The purpose and effect of the aforementioned fraudulent, material omissions has been to reduce the value of the health coverage for which Class Members paid premiums, so that Humana could be unjustly enriched by the difference between the value of the coverage actually provided and the premiums paid by Class Members based on the Humana Disclosure Documents.

(4)     Humana also knowingly misrepresented in the Humana Disclosure Documents that treatment and coverage decisions would be based on the Humana Medical Necessity Definition. This was an affirmative misrepresentation because Humana knew that Humana (and entities to whom Humana delegated responsibility for making coverage decisions or otherwise administering its health plans) made treatment and coverage decisions on the basis of financial incentives (set forth in paragraph 2(A)(3) above) as well as cost-based criteria unrelated to, and more restrictive than, the Medical Necessity Definition (see paragraph 2(A)(3)(b) above), all with the intended purpose on the part of Humana, and the effect, of

11

reducing the value of the health coverage for which Class Members paid through their premiums.   Humana knowingly and intentionally made these affirmative misrepresentations with the intent of misleading Class Members.

(5)     In making the aforementioned material omissions and misrepresentations to the plaintiffs and the members of the Class, Humana knew that plaintiffs and the Class Members would reasonably rely on the accuracy, completeness and integrity of Humana's disclosures, with the result that plaintiffs and the members of the Class paid premiums (by means of cash, salary deductions or labor) to purchase Humana health coverage and thereafter remained enrolled in Humana health plans.

(6)     Humana made the same material omissions and misrepresentations in disclosures to all members of the Class, and by means of these omissions and misrepresentations prevented the market for managed health care from being informed of the incentives, criteria and practices that Humana concealed.  Class Members thus were uniformly deceived, and uniformly relied to their detriment on Humana's omissions and misrepresentations because the managed health care market provided no alternative means for Class Members to learn the truth about the incentives, criteria and practices that Humana failed to disclose.

(7)     Had plaintiffs and the Class Members known of the aforementioned omissions and misrepresentations (and of the underlying criteria, financial incentives, and practices that Humana did not disclose), they would have taken corrective measures, including but not limited to withdrawing from their Humana health

plans, or requesting that their employer provide alternatives other than Humana health plans at the prevailing premium rates.

(8)     Humana's acts of fraud, described above, were a proximate cause of the injuries suffered by Class Members.  By reason of Humana's pattern of fraudulent conduct, Class Members paid premiums for health insurance coverage as described in the Humana Disclosure Documents, but received coverage that has been less valuable because of the incentives, criteria and practices that Humana has concealed from Class Members.  As an insurer and party to insurance transactions with Class Members, Humana had a duty to disclose material information and to refrain from material misrepresentations and omissions.  Class Members reasonably relied on Humana in accepting the completeness and accuracy of Humana's disclosures.  Moreover, for those Class Members whose health plans were covered by the Employment Retirement Income Security Act of 1974 ("ERISA") 29 U.S.C. §§ 1001-1169, Humana had statutory fiduciary obligations and, thus, a heightened duty to these Class Members who reasonably relied on the completeness of Humana's representations.

B.     The Basis of Defendant's Liability

As set forth in the preceding paragraphs and as below herein, Defendant Humana engaged in unlawful conduct in violation of RICO and in particular 18 U.S.C. § 1962(c).  Defendant Humana is alleged to be liable under 18 U.S.C.§ 1962(c) for conducting the affairs of the national enterprise and the state and local enterprises (described in detail in paragraphs 6(A) and 6(B) below) through an open-ended pattern of racketeering activity within the meaning of 18

13

U.S.C. § 1961(5), involving multiple predicate acts of mail fraud (18 U.S.C. § 1341).

Humana's wrongful acts amounted to a common course of conduct to deceive Class Members, by means of uniform written misrepresentations and omissions, as to the type and extent of the health insurance coverage offered by Humana health plans, and for which Class Members paid premiums (by means of cash, salary deductions and/or labor). Humana's wrongful acts all had the same pattern and similar purpose of defrauding Class Members for the benefit. Humana's wrongful conduct, set forth herein, is part of Humana's ongoing way of doing business and has constituted a continuing threat to the property of the Class Members.

3. <u>Other wrongdoers.</u>

Not applicable. The claims in this action only concern wrongful conduct by Defendant Humana.

4. A. <u>The Victims of Defendant's Wrongdoing.</u>

The plaintiffs and Class Members were the victims of Defendant Humana's wrongful conduct. As set forth in more detail above and elsewhere herein, the Class Members were induced by a continuing pattern of fraudulent statements and omissions to subscribe to health care plans offered by Humana, and at premium rates materially affected by those fraudulent statements and omissions, when in fact the health insurance coverage provided by Humana was worth less (as a result of Humana's undisclosed incentives, criteria and practices) than the premiums paid by members of the Class (through cash, salary deductions and/or labor).

The alleged "RICO Class" in this action consists of all persons in the United States who purchased coverage or otherwise participated in HMO's, PPO's, and/or POS's operated by Humana at any time during the period from October 4, 1995 through and after the date of the

14

Complaint until Humana's continuing illegal and wrongful conduct has ceased (the "RICO Class Period").

B.    When and How Each Victim Was Injured

Since October 4, 1995, each member of the Class was induced by Humana's wrongful conduct (described in Sections 1 and 2 above) to subscribe to Humana health plans at prevailing premium rates, even though, as a result of incentives, criteria and practices that Humana concealed from Class Members, the health insurance coverage provided by Humana was actually worth less than the premiums paid by Class Members (in cash, salary deductions and/or labor).

Plaintiffs were injured in their business and property by defendant's wrongdoing because Humana intended to and did provide to the members of the Class insurance coverage of lesser value than the coverage disclosed to Class Members in Humana's Disclosure Documents and reflected in the premiums paid by Class Members.  Humana intended to retain, and did retain, the difference in value between the coverage described in the Humana Disclosure Documents and the coverage actually provided to members of the Class.  Humana's wrongful conduct directly and proximately injured each member of the Class in an amount, to be determined at trial, equal to the difference in value between (a) the premiums paid by Class Members, reflecting the health insurance coverage described by Humana in the Humana Disclosure Documents, and (b) the value of the insurance coverage actually provided to Members of the Class.  (See paragraph 13(c), and Sections 15 and 17, below, discussing damages and injury in more detail).

The injury to each Class Member occurred throughout the RICO Class Period, or during such portion of the RICO Class Period when a Class Member has been enrolled (and paying premiums through cash, salary deductions or labor) in a Humana HMO, PPO or POS plan.

This action does not in any way concern any personal injuries to members of the Class relating to a failure by Humana to provide medical treatment or coverage. Nor does the Complaint allege that plaintiffs or the Class Members were personally injured by a diminished quality of care from particular doctors, hospitals or other health care providers.

Rather, the injury at issue in this case is the overpayment of premiums, where the premium rates paid by Class Members were higher than they would have been had those rates reflected the incentive arrangements, criteria by which decisions on claims and benefits were made, and other practices, detailed in Section 2 above, that Humana concealed from the Class Members. It is the value of the health insurance *coverage* that is at issue. Premiums are the consideration paid by Class Members for that coverage. And this *insurance coverage* is certainly distinct from any *care* or *treatment* provided to Class Members by Humana, since Class Members do not receive a refund of premiums in periods when Class Members remain *covered* as a result of the premium payments but do not make any actual claims or other requests for actual medical *care or treatment.*

5.    Pattern of racketeering/criminal activities.

A.    Predicate acts

Humana participated in the operation and management of a national health care network, and state and local health care networks (see paragraphs 6(A) and 6(B) below) through an open-ended pattern of racketeering activity within the meaning of 19 U.S.C. § 1961(5). This pattern of racketeering activity has involved predicate acts of mail fraud (18 U.S.C. §§ 1341), with the purpose and goal of fraudulently inducing persons to join Humana health plans at prevailing premium rates, thereby permitting Humana to enrich itself unjustly by providing health insurance

coverage of lesser value than the premiums paid to Humana by the Class Members.

Defendant maintained a continuing pattern of racketeering activities within the meaning of 18 U.S.C. § 1961(5), consisting of knowingly misrepresenting and selling coverage for medical services under the health plans provided to Class Members; fraudulently failing to disclose material information; and secretly administering the health plans with intent to defraud the Class Members, all by use of the United States Postal Service in violation of 18 U.S.C. §§ 1341 and 1342, throughout the RICO Class Period.

Defendant's wrongful acts amounted to a common course of conduct to deceive Class Members, by means of uniform written misrepresentations and omissions, as to the type and extent of insurance coverage provided by Humana health plans, and failing to disclose the financial and other incentives, criteria for reviewing claims and making treatment decisions, and other practices used by Humana to affect the type and extent of coverage actually provided by the Humana health plans.

Humana's wrongful acts all had the same pattern and similar purpose of defrauding Class Members for the benefit of Humana. Each such act of racketeering was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims. Such activities are part of Defendant's ongoing way of doing business and constitute a continuing threat to the property of the Class Members.

As described in further detail in Section 2 above, since October 1995 Humana has repeatedly delivered or caused to be delivered the Humana Disclosure Documents to Class Members, by means of the United States Postal Service. As described in further detail in paragraph 2(A)(2) above, Humana knowingly stated in the Humana Disclosure Documents that

17

treatment and coverage decisions under Humana Health Plans would be based on the Humana Medical Necessity Definition.

In the Humana Disclosure Documents, however, Humana has fraudulently concealed from Class Members numerous practices that have the purpose and effect of reducing the value of the Health Plans for which Class Members paid through their premiums:

(a)     The Humana Disclosure Documents failed to disclose that Humana provides direct cash bonuses and other financial incentives to claims reviewers who deny claims for services or limit hospital admissions and stays regardless of whether those claims or hospital admissions otherwise satisfied the Humana Medical Necessity Definition. The bonuses and financial incentives provided by Humana have included, among other things, a "Utilization Incentive Plan" that has provided for direct bonus payments and other benefits to claims reviewers who denied a certain percentage or number of submitted claims for hospital costs from Class Members, irrespective of whether the submitted claims satisfied the Medical Necessity Definition. These incentives thus reduced the value of the health coverage for which Class Members paid.

(b)     The Humana Disclosure Documents also failed to disclose that in addition to, or in place of, the Medical Necessity Definition, Humana uses undisclosed cost-based criteria to approve or deny benefit claims by Class Members. These undisclosed cost-based criteria include, without limitation: (i) Interqual Criteria; (ii) Milliman & Robertson guidelines; and (iii) guidelines and criteria developed and/or used by Value Health Sciences (hereinafter, the "Undisclosed Cost-Based

18

Criteria"). While the Undisclosed Cost-Based Criteria vary in detail, they all, in whole or in part, base coverage determinations on considerations other than medical necessity and inconsistent with the terms of the Humana Medical Necessity Definition set forth in the Humana Disclosure Documents. The Undisclosed Cost-Based Criteria were used by Humana to reduce the level of medically necessary services available to Class Members, and thereby did reduce the value of the health coverage for which Class Members paid.

(c)     The Humana Disclosure Documents failed to disclose that Humana subcontracts to third parties, such as Value Health Sciences, responsibility and authority to review claims and manage benefits, for certain medical conditions and medical procedures. In determining payment eligibility for claims submitted by Class Members, these third parties use criteria different from, and more restrictive than, the Humana Medical Necessity Definition.

(d)     The Humana Disclosure Documents failed to disclose that in determining payment eligibility for claims submitted by Class Members, Humana (as well as third parties with whom Humana subcontracted) has used both physicians and non-physicians who have lacked the training and specialization necessary to determine whether particular benefits should be provided in accordance with the Humana Medical Necessity Definition furnished to Class Members in the Humana Disclosure Documents.

(e)     The Humana Disclosure Documents failed to disclose that Humana creates direct financial incentives to treating physicians and other health care professionals to

deny coverage to individuals enrolled in Humana health plans, even when the treatment for which coverage is proposed satisfies the Humana Medical Necessity Definition. Among other things, Humana failed to disclose that:

(i)     Humana enters into risk-sharing arrangements with physicians, including without limitation so-called "capitated payment" arrangements, that provide treating physicians with financial incentives not to prescribe or recommend particular treatments for Class Members.

(ii)     Humana contracts to use Value Health Services' Practice Review System to analyze the clinical practice patterns of individual physicians, physician networks and health care plans in order to identify both "cost effective" physicians and physicians who "over utilize" health services for their patients. Humana notifies network physicians of undesirable practice profiles (that is, health service utilization rates) and reminded them that Humana contracts only with practitioners who provide "appropriate utilization." These notifications pressure network physicians to restrict care and prescribe medical services that satisfy criteria other than those contained in the Humana Medical Necessity Definition.

(iii)     Humana engages in undisclosed automatic "downcoding" of claims submitted by physicians, a process whereby (among other things) Humana arbitrarily changes the benefits code assigned to rendered services so as to reduce the payments due physicians. Arbitrary and automatic downcoding creates a disincentive for physicians to perform certain medical

procedures, even when medically necessary, because they are not likely to be paid for them.

Taken together, these various undisclosed arrangements and incentives are designed by Humana to influence the extent of coverage available to Class Members in a manner that is inconsistent with the Humana Medical Necessity Definition, because such incentives are designed by Humana to make it more likely than otherwise that doctors would deny care (or a level of care) otherwise satisfying the criteria included in the Humana Medical Necessity Definition. The purpose and effect of the aforementioned fraudulent, material omissions has been to reduce the value of the health coverage for which Class Members paid premiums, so that Humana could be unjustly enriched by the difference between the value of the coverage actually provided and the premiums paid by Class Members based on the Humana Disclosure Documents.

Humana also knowingly misrepresented in the Humana Disclosure Documents that treatment and coverage decisions would be based on the Humana Medical Necessity Definition. This was an affirmative misrepresentation because Humana knew that Humana (and entities to whom Humana delegated responsibility for making coverage decisions or otherwise administering its health plans) made treatment and coverage decisions on the basis of financial incentives (set forth in paragraph 2(A)(3) above) as well as cost-based criteria unrelated to, and more restrictive than, the Medical Necessity Definition (see paragraph 2(A)(3)(b) above), all with the intended purpose by Humana, and effect, of reducing the value of the health coverage for which Class Members paid through their premiums.   Humana knowingly and intentionally made these affirmative misrepresentations with the intent of misleading Class Members.

21

In making the aforementioned material omissions and misrepresentations to the plaintiffs and the members of the Class, Humana knew that plaintiffs and the Class Members would reasonably rely on the accuracy, completeness and integrity of Humana's disclosures, with the result that plaintiffs and the members of the Class paid premiums (by means of cash, salary deductions or labor) to purchase Humana health coverage and thereafter remained enrolled in Humana health plans.

B.    <u>Dates, participants and facts surrounding predicate acts</u>

The predicate acts occurred throughout the RICO Class Period, in that Defendant Humana repeatedly sent Disclosure Documents, or caused Disclosure Documents to be sent, by means of the United States Postal Service to Class Members. By way of example only, during the relevant period, plaintiffs received certificates of coverage that Humana caused to be delivered by means of the United States Postal Service. These certificates included the Humana Medical Necessity Definition described above, but failed to disclose the financial incentives, criteria for decision making regarding treatment and benefits, and other practices, described above in Sections 2(A) and 5(A).

Defendant Humana (through its officers, employees, subsidiaries and agents) has created, reviewed and disseminated the fraudulent Disclosure Documents to the Class Members. As Humana acknowledges in its 1998 10-K filing with the Securities and Exchange Commission, "Centralized management services are provided to each health plan from the Company's headquarters and service centers. These services include management information systems, product administration, financing, personnel, development, accounting, legal advice, public relations, marketing, insurance, purchasing, risk management, actuarial, underwriting and claims

22

processing." Humana 1998 10-K at 14.

Moreover, as set forth in detail in paragraph 6(B) below, Humana maintains centralized control over the operations of the National Enterprise, and the State and Local Enterprises, described below, thereby controlling the incentives, the criteria by which decisions on claims, treatments and benefits are made, and the other practices that Humana conceals from Class Members and, more generally, from the market for managed health care.

The facts surrounding the predicate acts are set forth in detail in Section 5(A), and Sections 1 and 2, above.

C.    Circumstances constituting fraud

The conduct by Humana constituting fraud is set forth and described in detail in Sections 2 and 5(A) above.

The purpose and effect of the fraudulent, material omissions described in Sections 2(A) and 5(A) above has been to reduce the value of the health coverage for which Class Members paid premiums, so that Humana could be unjustly enriched by the difference between the value of the coverage actually provided and the premiums paid by Class Members based on the Humana Disclosure Documents.

Humana also knowingly misrepresented in the Humana Disclosure Documents that treatment and coverage decisions would be based on the Humana Medical Necessity Definition. This was an affirmative misrepresentation because Humana knew that Humana (and entities to whom Humana delegated responsibility for administering its health plans) made treatment and coverage decisions on the basis of financial incentives (set forth in paragraph 2(A)(3) above) as well as cost-based criteria unrelated to, and more restrictive than, the Medical Necessity

23

Definition (see paragraph 2(A)(3)(b) above), all with the intended purpose on the part of Humana, and the effect, of reducing the value of the health coverage for which Class Members paid through their premiums. Humana knowingly and intentionally made these affirmative misrepresentations with the intent of misleading Class Members.

In making the aforementioned material omissions and misrepresentations to the plaintiffs and the members of the Class, Humana knew that plaintiffs and the Class Members would reasonably rely on the accuracy, completeness and integrity of Humana's disclosures, with the result that plaintiffs and the members of the Class paid premiums (by means of cash, salary deductions or labor) to purchase Humana health coverage and thereafter remained enrolled in Humana health plans.

Humana knew that the aforementioned omissions and misrepresentations were material, because the information plainly was central to letting Class Members know where they stood with respect to the coverage and benefits provided by the Humana health plans. The aforementioned omissions and misrepresentations related to both the nature and extent of the coverage Class Members receive under their Humana health plans.

Humana made the same material omissions and misrepresentations in disclosures to all members of the Class, and by means of these omissions and misrepresentations prevented the market for managed health care from being informed of the incentives, criteria and practices that Humana concealed. Class Members thus were uniformly deceived, and uniformly relied to their detriment on Humana's omissions and misrepresentations because the managed health care market provided no alternative means for Class Members to learn the truth about the incentives, criteria and practices that Humana failed to disclose.

24

Had plaintiffs and the Class members known of the aforementioned omissions and misrepresentations (and of the underlying criteria, financial incentives, and practices that Humana did not disclose), they would have taken corrective measures, including but not limited to withdrawing from their Humana health plans, or requesting that their employer provide alternatives other than Humana health plans at the prevailing premium rates.

Humana's acts of fraud, described above, were a proximate cause of the injuries suffered by Class Members. By reason of Humana's pattern of fraudulent conduct, Class Members paid premiums for health insurance coverage as described in the Humana Disclosure Documents, but received coverage that has been less valuable because of the incentives, criteria and practices that Humana has concealed from Class Members.

D.     Criminal convictions

To the best of plaintiffs' knowledge, there has not been a criminal conviction for any of the predicate acts/incidents of criminal activity described herein.

E.     The common plan – relationship between predicate act
       to each other and to an organizing principal

The predicate acts of mail fraud amounted to a common course of conduct to deceive Class Members by means of uniform written misrepresentations and omissions respecting the type and extent of insurance coverage provided under Humana health plans. Humana's wrongful acts all had the same pattern and similar purpose of defrauding Class Members for the benefit of Humana. Each act of racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims (the Class Members). Humana's acts of mail fraud were also related to each other in

that they were part of Humana's scheme or common plan to fraudulently induce enrollment in Humana health plans and to operate such health plans so as to provide less coverage of medical services than the coverage Class Members were fraudulently induced to purchase at prevailing premium rates.

Humana's wrongful conduct has been and remains part of Humana's ongoing way of doing business and constitutes a continuing threat to the property of the Class Members. Without the repeated acts of mail fraud, Humana's scheme to profit from the difference between the value of the coverage sold and the value of the coverage provided would not have succeeded.

F.    Threat of continued criminal activity

Humana's wrongful conduct poses a threat of continuing criminal activity. Humana has engaged in this wrongful conduct at least since October 1995, and Humana has taken no action to correct its wrongful conduct. Moreover, as noted above, Humana's wrongful acts all had the same pattern and similar purpose of defrauding Class Members for the benefit of Humana, while at the same time each predicate act involved the same or similar participants and methods of commission. Moreover, the wrongful conduct at issue has been and remains a part of Humana's ongoing way of doing business, permitting Humana to earn millions of dollars of profits from insurance premiums at rates not justified by the incentives, criteria and practices actually employed by Humana but not disclosed to the Class Members paying the premiums at prevailing rates.

6.    The Enterprise

A.    Names of Individuals and Other Entities Constituting the Enterprise

(1)    The National Enterprise

26

At all relevant times, there has existed a national health care network, assembled by Defendant Humana and consisting of Humana and Humana health plans, as well as including health care providers throughout the country not employed or owned by Humana, including primary doctors, medical specialists, medical laboratories, hospitals, outpatient centers, pharmacies and home health agencies, all associated, through contracts or other arrangements, as part of the health care network for the common purposes of providing medical services to Humana customers (the Class Members) and earning profits from the provision of those services. (The national network is hereinafter referred to as the "National Enterprise").

The National Enterprise is composed of:

(a)  Humana and the Humana subsidiaries set forth in Paragraph 21 of the Complaint (copy attached hereto as Exhibit A);

(b)  the primary doctors in private practice, who are not employees of Humana or its subsidiaries, but who contract with Humana or its subsidiaries to provide primary care to Class Members through Humana health plans;

(c)  medical specialists who are not employees of Humana or its subsidiaries but who contract or make other arrangements with Humana or its subsidiaries to provide care to Class Members;

(d)  medical laboratories that are not owned by Humana or its subsidiaries but that contract with Humana or its subsidiaries to provide diagnosis and other laboratory services for Humana and to Class Members;

(e)  hospitals that are not owned by Humana or its subsidiaries but that contract with Humana to provide hospital facilities and services for Humana and to Class

27

Members;

(f)    outpatient centers that are not owned by Humana or its subsidiaries but that
contract with Humana to provide outpatient services for Humana and to Class
Members;

(g)    pharmacies that are not owned by Humana or its subsidiaries but that contract
with Humana to provide pharmaceutical services for Humana and to Class
Members; and

(h)    home health centers that are not owned by Humana or its subsidiaries but that
contract with Humana to provide home health services for Humana and to Class
Members.

The Complaint does not allege any sort of "industry-wide" enterprise. Rather, the
National Enterprise, as specifically described above, is a health care network operated and
maintained by Humana and which Humana itself describes in Disclosure Materials, including the
Humana Internet Web Site.

(2)    The State and Local Enterprises

At all relevant times, in each state where Humana health plans operate, there have existed
one or more state and/or local health care networks, assembled by Humana and consisting of
Humana and the state and/or local Humana health plan(s), as well as persons and entities not
employed or owned by Humana, including primary doctors, medical specialists, medical
laboratories, hospitals, outpatient centers, pharmacies and home health agencies. (These state
and local health networks are hereinafter referred to as the "State and Local Enterprises.")

Each of the State and Local Enterprises is composed of:

28

(a)  Humana and one or more of the Humana subsidiaries set forth in paragraph 21 of the Complaint (copy annexed hereto as Exhibit A);

(b)  the primary doctors in private practice, who are not employees of Humana or its subsidiaries, but who contract with Humana or its subsidiaries to provide primary care to Class Members through the Humana health plan or plans that are administered through the State or Local Enterprise;

(c)  medical specialists who are not employees of Humana or its subsidiaries, but who contract with Humana or its subsidiaries to provide care to Class Members through the Humana health plan or plans that are administered through the State or Local Enterprise;

(d)  medical laboratories that are not owned by Humana or its subsidiaries but that contract with Humana or its subsidiaries to provide diagnosis and other laboratory services for Humana and to Class Members through the Humana health plan or plans that are administered through the State or Local Enterprise;

(e)  hospitals that are not owned by Humana or its subsidiaries but that contract with Humana to provide hospital facilities and services for Humana and to Class Members through the Humana health plan or plans that are administered through the State or Local Enterprise;

(f)  outpatient centers that are not owned by Humana or its subsidiaries but that contract with Humana to provide outpatient services for Humana and to Class Members through the Humana health plan or plans that are administered through the State or Local Enterprise;

(g)     pharmacies that are not owned by Humana or its subsidiaries but that contract

with Humana to provide pharmacy services for Humana and to Class Members

through the Humana health plan or plans that are administered through the State

or Local Enterprise; and

(h)     home health centers that are not owned by Humana or its subsidiaries but that

contract with Humana to provide home health services for Humana and to Class

Members through the Humana health plan or plans that are administered through

the State or Local Enterprise.

The Complaint does not allege any sort of "industry-wide" enterprise. Rather, the State

and Local Enterprises, as specifically described above, are health care networks operated and

maintained by Humana and which Humana itself describes in Disclosure Materials, including the

Humana Web Site.

B.      Structure, Purposes, Roles, Functions and Course of Conduct of the Enterprise

(1)     The National Enterprise

As noted above, the National Enterprise is a national health care network that has been

assembled by Defendant Humana and consists of Humana and Humana health plans, as well as

health care providers throughout the country not employed or owned by Humana, including

primary doctors, medical specialists, medical laboratories, hospitals, outpatient centers,

pharmacies and home health agencies, all associated, through contracts or other arrangements, as

part of the health care network.

The participants in the National Enterprise are associated in fact as part of the national

health care network (and the National Enterprise is an association-in-fact) for the common

30

purposes of providing medical services to Humana customers (the Class Members) and earning profits from the provision of those services. The National Enterprise constitutes an on-going organization with participants that function as a continuing unit.

The National Enterprise is centrally operated from Humana's national headquarters in Louisville, Kentucky. Humana purposefully created a centralized structure to carry out its fraudulent scheme of disseminating misleading statements and material omissions in Humana Disclosure Documents sent to Class Members. The National Enterprise includes the following structural and operational features:

(a)    "Nationally, Humana has assembled one of health care's largest networks." (Humana Web Site.)

(b)    "Centralized management services are provided to each health plan from the Company's headquarters and service centers. These services include management information systems, product administration, financing, personnel, development, accounting, legal advice, public relations, marketing, insurance, purchasing, risk management, actuarial, underwriting and claims processing." (Humana 1998 10-K at 14.)

(c)    "Humana operates one of the largest managed care data centers in the nation. The primary computing facility is located in Louisville, Kentucky. Humana's application systems are largely developed and maintained in-house by a staff of 400 application programmers who are versed in the use of state-of-the-art technology. . . . The information systems support marketing, sales, underwriting, contract administration, billing, financial, and other administrative functions as

31

well as customer service, authorization and referral management, concurrent review, physician capitation and claims administration, provider management, quality management and utilization review." (Humana Web Site.)

(d)    "Humana's Information Systems organization operates in a centralized manner. Humana's data center and the majority of its programming and support staff are located at its corporate offices in Louisville, Kentucky." (Humana Web Site.)

(e)    "The Company [defendant Humana] is a health services company that facilitates the delivery of health care services through networks of providers to its approximately 6.1 million medical members. The Company's products are marketed primarily through health maintenance organizations ('HMOs') and preferred provider organizations ('PPO's') that encourage or require the use of contracted providers." (Humana 1999 10-Q (First Quarter), at 11-12.)

(f)    The administration of Humana's utilization management program is shared among a centralized staff located in Louisville and staff located in each market.

(g)    The Corporate Medical Affairs Department in Louisville forwards several reports to the local markets on a monthly basis to enable them to track the performance of individual physicians.

(h)    Pre-admission review is a centralized operation based in Louisville, including pre-admission certification for PPO's and pre-admission notification for HMO's.

As set forth in detail in Sections 1, 2, 5 and 6 above, Defendant Humana, in violation of 18 U.S.C. § 1962(c), conducted and participated in the conduct of the affairs of the National Enterprise during the RICO Class Period through the ongoing pattern of racketeering activity

32

described herein in Section 5.

(2)    The State and Local Enterprises

As noted above, in each state where Humana Health Plans operate, Humana has assembled one or more state and/or local health care networks, each consisting of Humana and the state and/or local Humana health plan(s), as well as persons and entities not employed or owned by Humana, including: primary doctors, medical specialists, medical laboratories, hospitals, outpatient centers, pharmacies and home health agencies.

The participants in each State and Local Enterprise are associated in fact (and each State and Local Enterprise is an association-in-fact) for the common purposes of (i) providing medical services to Humana subscribers and (ii) earning profits from the providing of those services. Each State and Local Enterprise constitutes an on-going organization with participants that function as a continuing unit.

Each State and Local Enterprise is centrally operated from Humana's national headquarters in Louisville, Kentucky.  Humana purposefully created a centralized structure to carry out its fraudulent scheme of disseminating misleading statements and material omissions Humana Disclosure Documents sent to Class Members.  The features of the structure and operation of the State and Local Enterprises include the following:

(a)    "Nationally, Humana has assembled one of health care's largest networks. Locally, where care is delivered, our networks are as deep as they are broad, with primary doctors, specialists, lab services, hospitals, outpatient centers, pharmacies and home health agencies." (Humana Web Site.)

(b)    "Centralized management services are provided to each health plan from the

Company's headquarters and service centers. These services include management information systems, product administration, financing, personnel, development, accounting, legal advice, public relations, marketing, insurance, purchasing, risk management, actuarial, underwriting and claims processing." (Humana 1998 10-K at 14.)

(c)     "Humana operates one of the largest managed care data centers in the nation. The primary computing facility is located in Louisville, Kentucky. Humana's application systems are largely developed and maintained in-house by a staff of 400 application programmers who are versed in the use of state-of-the-art technology. . . .  The information systems support marketing, sales, underwriting, contract administration, billing, financial, and other administrative functions as well as customer service, authorization and referral management, concurrent review, physician capitation and claims administration, provider management, quality management and utilization review." (Humana Web Site.)

(d)     "Humana's Information Systems organization operates in a centralized manner. Humana's data center and the majority of its programming and support staff are located at its corporate offices in Louisville, Kentucky." (Humana Web Site.)

(e)     "The Company [defendant Humana] is a health services company that facilitates the delivery of health care services through networks of providers to its approximately 6.1 million medical members. The Company's products are marketed primarily through health maintenance organizations ('HMOs') and preferred provider organizations ('PPO's') that encourage or require the use of

34

contracted providers." (Humana 1999 10-Q (First Quarter), at 11-12).

(f)     The administration of Humana's utilization management program is shared among a centralized staff located in Louisville and staff located in each market.

(g)     The Corporate Medical Affairs Department in Louisville forwards several reports to the local markets on a monthly basis to enable them to track the performance of individual physicians.

(h)     "The Company's subsidiaries operate in states which require certain levels of equity and regulate the payment of dividends to the parent company." (Humana 1999 10-Q (First Quarter) at 15.)

(i)     Pre-admission review is a centralized operation based in Louisville, including pre-admission certification for PPO's and pre-admission notification for HMO's.

As set forth in detail in Sections 1, 2, 5 and 6 above, Defendant Humana, in violation of 18 U.S.C. § 1962(c), conducted and participated in the conduct of the affairs of the State and Local Enterprises during the RICO Class Period through the ongoing pattern of racketeering activity described herein in Section 5.

C.     <u>The Defendant is Not and Employee or Officer of the Enterprise</u>

Defendant Humana, Inc., is not an employee, officer or director of the National Enterprise or the State and Local Enterprises.

D.     <u>Defendant is Associated with the Enterprise</u>

Defendant is a "person" within the meaning of section § 1962(c) of RICO that is, as described in detail in paragraph 6(A) above, associated with the National Enterprise and is associated with the State and Local Enterprises.

E.     The Defendant is Distinct from the Alleged Enterprise

As set forth above, Defendant Humana is one of the entities participating in the association-in-fact that constitutes the National Enterprise, and is one of the entities participating in the associations-in-fact that constitute the State and Local Enterprises. However, Defendant Humana is different and distinct from both the National Enterprise and the State and Local Enterprises. As described herein, Defendant Humana is the perpetrator of the pattern of racketeering activity through which it has conducted and participated in the conduct of the affairs of the National Enterprise and the affairs of the State and Local Enterprises.

7.     Relationship Between the Pattern of Racketeering Activity and the Enterprise

The pattern of racketeering activity alleged in the Complaint and the Enterprise alleged in the Complaint are separate and distinct from each other. Humana engaged in the pattern of racketeering activity alleged in the Complaint for the purpose of conducting the affairs of the alleged enterprise – a national health care network, and state and local health care networks, consisting of Humana, the Humana health plans, primary doctors, medical specialists, medical laboratories, hospitals, outpatient centers, pharmacies and home health agencies.

The participants in each of the national, state and local health care networks, including Defendant Humana, were associated in fact for the common purposes of providing health insurance coverage and medical services to Humana customers and earning profits from the provision of those services.

8.     The Relationship Between the Racketeering Activity and the Activities of the Enterprise

Humana, as described above in Sections 1, 2, 5 and 6, above, conducted the activities of the alleged association-in-fact enterprises through the pattern of racketeering activity also

36

described above. At the same time, the National Enterprise and the State and Local Enterprises engaged in many activities that were distinct from Humana's illegal conduct used to conduct the affairs the National Enterprise, and of the State and Local Enterprises. The pattern of racketeering activity set forth above is not the same as the activities of the National Enterprise and the State and Local Enterprises described above.

9.    Benefits of the Racketeering Activity

Defendant Humana benefitted from its pattern of wrongful conduct by using the proceeds of that conduct to earn profits, to maintain control over the National Enterprise and the State and Local Enterprises, and to sustain the solvency of the National Enterprise, the State and Local Enterprises, and of Humana itself. Through its pattern of racketeering activity, Humana was able to cause Class Members to pay, directly or indirectly, periodic premiums of health insurance coverage. As a result of this wrongful conduct, Humana unjustly retained the difference between the value of the coverage promised to the RICO Class in the Humana Disclosure Documents and paid for by Class Members (through cash, salary deductions and/or labor) in the form premiums to Humana, and the lesser value of the insurance coverage actually provided to Class Members as a result of the financial and other incentives, criteria by which decisions regarding treatment and benefits are made, and other practices that Humana concealed from Class Members.

10.    Effect of Enterprise's Activities on Interstate Commerce.

Defendant Humana operates a national interstate health network, with 95% of Humana's membership in 15 states – including Florida, as well as Alabama, Arizona, Arkansas, Georgia, Illinois, Indiana, Kentucky, Mississippi, Ohio, South Carolina, Tennessee, Texas, Wisconsin and Wyoming – and Puerto Rico. Humana offers health plans and other employee benefit products in

37

at least 38 states, including (in addition to the 15 states listed above) Alaska, California, Nevada, Idaho, North Dakota, South Dakota, Colorado, Nebraska, Missouri, Oklahoma, Luoisiana, Iowa, New Jersey, Utah, Maryland, Virginia, West Virginia, North Carolina, Michigan, New Mexico, Hawaii and Kansas.  Since 1983, Humana, through a network of providers, has offered health care services to approximately 6.2 million persons annually.  Humana contracts with more than 9,200 primary care physicians and specialists and 73 hospitals to provide health care through its HMOs and PPOs.

This conduct described above, and alleged in the Complaint, involves the conduct of, and affects, interstate commerce, and involves assets and revenues in excess of hundreds of millions of dollars annually, in an amount to be determined at trial.   In executing the fraudulent scheme by conducting the affairs of the National Enterprise, and the State and Local Enterprises, as described above, Defendant Humana also repeatedly caused Disclosure Documents, and other matters and things, to be delivered by the United States Postal Services through the United States.  The pattern of racketeering activity alleged in the Complaint is within the flow of, and substantially affects, interstate commerce.

11.     Not applicable.

12.     Not applicable.

13.     <u>Claim under 18 U.S.C. §1962(c)</u>

A.     <u>Person Associated with the Enterprise</u>: As set forth in detail in Section 6 above, Defendant Humana is a "person" associated with the National Enterprise (an association-in-fact enterprise) and is associated with the State and Local Enterprises (each an association-in-fact enterprise).  The other parties associated with the National Enterprise, and with the State and

Local Enterprises, are set forth in paragraph 6(A) above.

      B.    <u>Conduct of the Affairs of the Enterprise</u>:  As set forth in Sections 1, 2, 5 and 6 above, Humana conducted or participated in the conduct of the enterprise's affairs through the pattern of racketeering activities described above.

      C.    <u>Direct Injuries as a Result of Humana's Conducting or Participating in the Enterprise's Affairs</u>:  Plaintiffs and the Class Members paid periodic premiums that reflected the value of the health insurance coverage described in the Humana Disclosure Documents, rather than the actual value of that insurance coverage in light of the incentives, criteria for decision making, and other practices, described above in detail in paragraph 2(A)(3), that Humana concealed from the members of the Class.  As a direct and proximate result of Humana's wrongful conduct of the affairs of the National Enterprise, and the State and Local Enterprises, as described in detail above in Sections 1, 2, 5 and 6, Humana unjustly retained the difference between (i) the value of the coverage promised to the Class Members in the Disclosure Documents and paid for by Class Members (with cash, salary deductions and/or labor) in the form of premiums, and (ii) the value of the coverage actually provided by Humana to Class Members in light of the incentives, criteria for decision making, and other practices, described above in paragraph 2(A)(3), but not disclosed by Humana to members of the Class.  These damages are of an amount to be determined at trial.

      As a direct and proximate result of Humana's violations of 18 U.S.C. § 1962(c), the Class Members have been injured in their business or property.  The business and property of the Class Members were directly and proximately injured as a result of Defendant's racketeering activities, as described above, in that but for Defendant's fraudulent conduct, racketeering activities and

knowing misrepresentations of the coverage actually provided to Class Members, the Class Members would not have paid as much for the health insurance coverage as, in fact, they paid in cash, salary deductions and/or labor. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to bring this action on behalf of the Class Members, and Plaintiffs and the Class Members are entitled to recover actual and treble damages, the costs of bringing this suit, and attorneys' fees.

Defendant's conduct of the affairs of the aforementioned National Enterprise and the State and Local Enterprises injured Class Members in their business and property in that the Defendant operated the aforementioned enterprises for the purpose and with the effect of (i) promoting, selling and implementing Class Members' health policies under the fraudulently false representation that the coverage of medically necessary treatment described in the Disclosure Documents was the same as the coverage of medically necessary treatment actually provided by Defendant to the Class Members; and (ii) inducing Class Members to pay more in premiums (through cash, salary deductions, or labor) than the actual value of the insurance coverage actually provided by Defendant's health plans.

The property of which Class Members were deprived by Defendant's fraudulent and deceptive practices consists of the difference between the value paid to Humana in premiums by Class Members (in cash, salary deductions, and/or labor) and the actual value of the insurance coverage provided to Class Members by Defendant in light of the incentives, criteria and other practices that Humana did not disclose.

*The injury to plaintiffs and the Class Members is neither speculative nor hypothetical, but has already occurred as a result of overpayment to Humana (through cash, salary deductions and/or labor) by plaintiffs and the Class Members of the premiums for health insurance*

coverage provided through Humana health plans.

Moreover, as noted above, this action does not in any way concern any personal injuries to members of the Class resulting from any failure by Humana to provide medical treatment or coverage. The Complaint also does _not_ allege that plaintiffs or the Class Members were personally injured by a diminished quality of care from particular doctors, hospitals or other health care providers.

Rather, the injury at issue in this case is the overpayment of premiums, where the premium rates paid by Class Members were higher than they would have been had those rates reflected the incentive arrangements, criteria for decisions on claims and benefits, and other practices, detailed in paragraph 2(A)(3) above, that Humana concealed from the Class Members. It is the value of the health insurance _coverage_ that is at issue. Premiums are the consideration paid by Class Members for that coverage. And this insurance _coverage_ is plainly distinct from any _care_ or _treatment_ provided to Class Members by Humana, since Class Members do not receive a refund of premiums in periods when Class Members remain covered as a result of the premium payments but do not make any actual claims or other requests for actual medical care or treatment.

The monetary value – i.e., the amount – of the difference between the premiums paid and the value of the coverage actually provide is not speculative and will be proved at trial using, among other things, economic and actuarial evidence concerning (i) how the incentives, criteria and procedures not disclosed by Humana affect rates of utilization of medical services and benefits, as well as reduce Humana's costs associated with providing such services and benefits; and (ii) the relationship between such utilization rates and costs and the setting of

41

*premiums (including, specifically, how much premiums should be reduced to account for the specific incentives, criteria and procedures that Humana utilized but failed to disclose).*

D.      As explained above, Humana is a person <u>associated</u> with the National Enterprise and with the State and Local Enterprises, but Humana is *not* the enterprise itself.

14.     Not applicable.

15.     <u>Injury to Business or Property</u>

As a direct and proximate result of Humana's violations of 18 U.S.C. § 1962(c), the Class Members have been injured in their business or property.  The business and property of the Class Members were directly and proximately injured as a result of Defendant's racketeering activities, as described above, in that but for Defendant's fraudulent conduct, racketeering activities and knowing misrepresentations of the coverage actually provided to Class Members, the Class Members would not have paid as much for the health insurance coverage as, in fact, they paid in cash, salary deductions and/or labor.  Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to bring this action on behalf of the Class Members, and Plaintiffs and the Class Members are entitled to recover actual and treble damages, the costs of bringing this suit, and attorneys' fees.

Defendant's conduct of the affairs of the aforementioned National Enterprise and the State and Local Enterprises injured Class Members in their business and property in that the Defendant operated the aforementioned enterprises for the purpose and with the effect of (i) promoting, selling and implementing Class Members' health policies under the fraudulently false representation that the coverage of medically necessary treatment described in the Disclosure Documents was the same as the coverage actually provided by Defendant to the Class Members; and (ii) inducing Class Members to pay more in premiums (through cash, salary deductions, or

labor) than the actual value of the insurance coverage actually provided by Defendant's health plans.

The property of which Class Members were deprived by Defendant's fraudulent and deceptive practices consists of the difference between the value paid to Humana in premiums by Class Members (in cash, salary deductions, and/or labor) and the actual value of the insurance coverage provided to Class Members by Defendant in light of the incentives, criteria and other practices that Humana did not disclose.

*As noted above, the injury to plaintiffs and the Class Members is neither speculative nor hypothetical, but has already occurred as a result of overpayment to Humana (through cash, salary deductions and/or labor) by plaintiffs and the Class Members of the premiums for health insurance coverage provided through Humana's health plans.*

*Moreover, as noted above, this action does not in any way concern any personal injuries to members of the Class resulting from any failure by Humana to provide medical treatment or coverage. Nor does the Complaint allege that plaintiffs or the Class Members were personally injured by diminished quality of care from particular doctors, hospitals or other health care providers.*

*Rather, the injury at issue in this case is the overpayment of premiums, where the premium rates paid by Class Members were higher than they would have been had those rates reflected the incentive arrangements, criteria for decisions on claims and benefits, and other practices, detailed in paragraph 2(A)(3) above, that Humana concealed from the Class Members. It is the value of the health insurance <u>coverage</u> that is at issue. Premiums are the consideration paid by Class Members for that health insurance coverage. And this insurance*

43

*coverage* is certainly distinct from any *care* or *treatment* provided to Class Members by
Humana, since Class Members do not receive a refund of premiums in periods when Class
Members remain covered as a result of the premium payments but do not make any actual claims
or other requests for actual medical care or treatment.

The monetary value – i.e., the amount – of the difference between the premiums paid
and the value of the coverage actually provide is not speculative and will be proved at trial
using, among other things,  economic and actuarial evidence concerning (i) how the incentives,
criteria and procedures not disclosed by Humana affect rates of utilization of medical services
and benefits, as well as reduce Humana's costs associated with providing such services and
benefits; and (ii) the relationship between such utilization rates and costs and the setting of
premiums (including, specifically, how much premiums should be reduced to account for the
specific incentives, criteria and procedures that Humana utilized but failed to disclose).

16.    Relationship Between the Injury and Each Separate RICO Violation

Plaintiffs allege that Humana continuously violated RICO as it conducted the affairs of
the association-in-fact enterprise from October 1995 through the present through a pattern of
racketeering activities.  Plaintiffs do not allege separate RICO violations but a continuous series
of predicate acts, comprising the RICO violation alleged, consisting of Humana's conduct of the
affairs of the National Enterprise, and the State and Local Enterprises, through a pattern of
multiple acts of mail fraud, as described in detail above in Sections 1, 2, 5 and 6.

Defendant Humana's wrongful actions amounted to a common course of conduct to
deceive Class Members, by means of uniform written misrepresentations and omissions
regarding the type and extent of their coverage under their Humana health plans.  (See Sections 2

44

and 5 above.)   As also set forth above at paragraphs 5(A), 5(C) and 13(C), Humana's wrongful

acts all had the same pattern and similar purpose of defrauding Class Members for the benefit of

Humana.  Each such act of racketeering was related, had similar purposes, involved the same or

similar participants and methods of commission, and had similar results affecting the Class

Members.

17.     <u>Damages and amount of Defendant's liability.</u>

        Plaintiffs and the Class Members paid periodic premiums that reflected the value of the

health insurance coverage described in Humana's Disclosure Documents, rather than the actual

value of that insurance coverage in light of the incentives, criteria for decision making, and other

practices, described above in detail in paragraphs 2(A)(3), that Humana concealed from the

members of the Class.  As a direct and proximate result of Humana's wrongful conduct,

described in detail above in Sections 1, 2 and 5, Humana unjustly retained the difference between

(i) the value of the coverage promised to the Class Members in the Disclosure Documents and

paid for by Class Members (with cash, salary deductions and/or labor)  in the form of premiums,

and (ii) the value of the coverage actually provided by Humana to Class Members in light of the

incentives, criteria for decision making, and other practices, described above in Sections 2(A)(3),

but not disclosed by Humana to members of the Class.  These damages are of an amount to be

determined at trial.

        As a direct and proximate result of Humana's violations of 18 U.S.C. § 1962(c), the Class

Members have been injured in their business or property.  The business and property of the Class

Members were directly and proximately injured as a result of Defendant's racketeering activities,

as described above, in that but for Defendant's fraudulent conduct, racketeering activities and

knowing misrepresentations of the coverage actually provided to Class Members, the Class Members would not have paid as much for the health insurance coverage as, in fact, they paid in cash, salary deductions and/or labor. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to bring this action on behalf of the Class Members, and Plaintiffs and the Class Members are entitled to recover actual and treble damages, the costs of bringing this suit, and attorneys' fees.

As described in more detail above in Sections 2(B), 13(C) and 15, the property of which Class Members were deprived by Defendant's fraudulent and deceptive practices consists of the difference between the value paid to Humana in premiums by Class Members (in cash, salary deductions, and/or labor) and the actual value of the insurance coverage provided to Class Members by Defendant in light of the incentives, criteria and other practices that Humana did not disclose.

*As noted above, the injury to plaintiffs and the Class Members is neither speculative nor hypothetical, but has already occurred as a result of over payment to Humana (through cash, salary deductions and/or labor) by plaintiffs and the Class Members of the premiums for health insurance coverage provided through Humana's health plans.*

*Moreover, as noted above, this action does not in any way concern any personal injuries to members of the Class resulting from any failure by Humana to provide medical treatment or coverage. Nor does the Complaint allege that plaintiffs or the Class Members were personally injured by a diminished quality of care from particular doctors, hospitals or other health care providers.*

*Rather, the injury at issue in this case is the overpayment of premiums, where the premium rates paid by Class Members were higher than they would have been had those rates*

reflected the incentive arrangements, criteria for decisions on claims and benefits, and other practices, detailed in paragraph 2(A)(3) above, that Humana concealed from the Class Members.  It is the value of the health insurance _coverage_ that is at issue.  Premiums are the consideration paid by Class Members for that health insurance coverage.  And this insurance _coverage_ is certainly distinct from any _care_ or _treatment_ provided to Class Members by Humana, since Class Members do not receive a refund of premiums in periods when Class Members remain covered as a result of the premium payments but do not make any actual claims or other requests for actual medical care or treatment.

The monetary value – i.e., the amount – of the difference between the premiums paid and the value of the coverage actually provide is not speculative and will be proved at trial using, among other things,  economic and actuarial evidence concerning (i) how the incentives, criteria and procedures not disclosed by Humana affect rates of utilization of medical services and benefits, as well as reduce Humana's costs associated with providing such services and benefits; and (ii) the relationship between such utilization rates and costs and the setting of premiums (including, specifically, how much premiums should be reduced to account for the specific incentives, criteria and procedures that Humana utilized but failed to disclose).

18.    <u>Additional Information Helpful in Adjudicating Claim</u>

Plaintiffs have gathered documentary evidence, previously provided to Defendant

pursuant to Local Rule 16, that Plaintiffs plan to present to the Court, at an appropriate juncture

in this action, to support the RICO claims set forth above and in the Complaint.

Respectfully submitted,

MILLER, SCHWARTZ & MILLER, P.A.

By: _____
James Fox Miller, Florida Bar No. 095070
Charles Fox Miller, Florida Bar No. 0970270
Greg A. Lewen, Florida Bar No. 0047422

2435 Hollywood Boulevard
Hollywood, Florida 33020
(954) 924-0300
(954) 924-0311 fax

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via U.S.

mail on Peter A. Sachs, Esquire, 505 South Flagler Drive, Suite 1100, Post Office Box 3475,

West Palm Beach, Florida 33402-3475, and Brian D. Boyle, Esquire, Robert N. Eccles, Esquire,

Jeffrey Kilduff, Esquire, 555 13th Street, N.W., Suite 500 West, Washington, DC 20004 on this

_____ day of February, 2000.

MILLER, SCHWARTZ & MILLER, P.A.


By: _____
James Fox Miller, Florida Bar No. 095070
Charles Fox Miller, Florida Bar No. 0970270
Greg A. Lewen, Florida Bar No. 0047422

2435 Hollywood Boulevard
Hollywood, Florida 33020
(954) 924-0300
(954) 924-0311 fax

49

# ADDITIONAL

# ATTACHMENTS

# NOT

# SCANNED

## PLEASE REFER TO COURT FILE